UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-10-706 |
| | § | |
| WILLIE LEE CLOUD, JR., *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

ORDER FOR ENTRY OF DEFAULT JUDGMENT,
PERMANENT INJUNCTION, CIVIL MONETARY PENALTIES
AND OTHER EQUITABLE RELIEF

On March 4, 2010, plaintiff U.S. Commodity Futures Trading Commission ("CFTC" or "Commission") filed its Complaint for a Permanent Injunction, Civil Monetary Penalties, and Other Equitable Relief ("Complaint") against defendants Willie Lee Cloud, Jr. ("Cloud") and C & R Financial, Inc. ("C & R Financial") (collectively "Defendants"), which alleged that Defendants violated the anti-fraud provisions of the Commodity Exchange Act (the "Act"), Section 4b(a)(2)(A)-(C), as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act ("CRA")), §§ 13101-13204, 122 Stat. 1651 (enacted June 18, 2008), to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C).  The Complaint further alleged that Cloud is liable as a controlling person of C & R Financial under Section 13(b) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 13(b), and that C & R Financial is liable under principal-agent theories, pursuant to Section 2(a)(1)(B) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(a)(1)(B).  The Complaint sought, inter alia, injunctive relief, disgorgement, restitution, and civil and monetary penalties.

Service of the Complaint was perfected on Defendants on April 5, 2010.  Therefore, Defendants' Answers were due on or before April 26, 2010.  Defendants have not filed or served their Answers.  On July 8, 2010, the Commission filed a Motion for Default Judgment Pursuant to Federal Rule of Civil Procedure 55(b), which this Court granted on July 30, 2010.  Pursuant to the Order granting the Commission a default judgment, the Commission was provided opportunity to conduct discovery regarding restitution, disgorgement, and civil monetary penalties.

The Commission now has submitted its Motion for Default Judgment, Permanent Injunction, Civil Penalties and Other Equitable Relief Pursuant to Federal Rule of Civil Procedure 55(b) and Memorandum in Support ("Default Motion").  The Court has considered carefully the Complaint, the allegations of which are well-pleaded and hereby taken as true, the Default Motion, and all exhibits in support thereof, and being fully advised, hereby:

**GRANTS** the Commission's Default Motion and enters the following findings of fact and conclusions of law finding Defendants liable as to all violations as alleged in the Complaint. Accordingly, the Court now issues the following Order for Entry of Default Judgment, Permanent Injunction, Civil Monetary Penalties, and Other Equitable Relief Pursuant to Federal Rule of Civil Procedure 55(a) ("Order"), which determines that Defendants have violated Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA; and that Defendant Cloud is liable as a controlling person of C & R Financial under Section 13(b) of the Act, as amended by the CRA; and that Defendant C & R Financial is liable under principal-agent theories, pursuant to Section 2(a)(1)(B) of the Act, as amended by the CRA.

# I.  FINDINGS OF FACT

## A.      Summary

From at least January 2008 to January 2010 (the "relevant period"), Defendants solicited over $585,000 from at least 37 members of the general public for the purpose of trading off-exchange foreign currency ("forex") contracts.  Defendants put a portion of these funds into forex trading accounts held in Cloud's name at various futures commission merchants ("FCMs"), but used the majority of customer funds provided for forex trading to repay earlier customers or for Defendants' personal expenses.  Therefore, Defendants were operating a Ponzi scheme.

## B.      Defendants Fraudulently Solicited Customers to Trade Forex

During the relevant period, Defendants solicited members of the public with false promises of enormous returns through forex trading.  Defendants promised customers they could "double" their investments within months or a year through Defendants' forex trading.  Defendants encouraged one customer to take out a $10,000 line of credit based on representations that another customer had taken out a $100,000 line of credit to invest with Defendants and had been able to repay that line of credit within a few months with forex trading gains.  Defendants told this customer that she would make "at least a few thousand dollars a month" on her investment and would be able to pay off her line of credit within "a few months."

Defendants also made misrepresentations to customers about the trading accounts in which their investments would be placed.  Defendants solicited customers with the promise that their investments would be placed in individual trading accounts at an FCM from which Defendants would trade forex.  Defendants induced these customers to complete account application forms for at least two different registered FCMs, purportedly so that Defendants could open individual trading

accounts for each customer.  However, Defendants did not, with the exception of one customer, forward these account application forms to the FCMs and did not open accounts in the names of these customers with any FCM.  Rather, Defendants pooled together customer funds and placed a portion of those funds into trading accounts in Cloud's name.

**C.      Defendants Misappropriated Over $280,000 of Customer Funds**

Lured by misrepresentations, at least 37 customers sent more than $585,000 to C & R Financial during the relevant period.  Defendants returned approximately $207,000 to customers. Of the $378,000 remaining, Defendants lost nearly $98,000 trading forex.  Defendants misappropriated the remaining $280,000.

Because Defendants did not make profits trading forex, but instead suffered significant losses, the repayment of principal and purported profits to customers must have come from the principal of other existing or subsequent customers.  Therefore, Defendants operated a Ponzi scheme.

Defendants used customer funds for a variety of personal and business expenses, including child support payments, anger management sessions, hundreds of meals and a 1971 Oldsmobile. Defendants also were charged thousands of dollars in overdraft fees from banks due to repeatedly overdrawing Cloud's personal and C & R Financial's corporate accounts.  Defendants repeatedly commingled customer funds, which came into C & R Financial's corporate accounts, in Cloud's personal bank account.  Defendants also withdrew approximately $148,000 in cash during the relevant period. As of December 2010, all bank accounts in the names of Defendants and companies operated by Defendants are empty.  Likewise, all trading accounts in Cloud's name are virtually empty.

**D.      Defendants Traded Only Some Customer Funds and Lost a Majority of those Funds**

Defendants solicited customers to invest in individual trading accounts to be held at GFS Forex & Futures, Inc. ("GFS") or iTrade FX, LLC ("iTrade"), both registered FCMs. However, Defendants did not open any accounts for these customers at GFS and opened only one account at iTrade for one customer, which Defendants never funded. Instead, Defendants deposited approximately $170,000 in customer funds in trading accounts in Cloud's name at iTrade, Forex Capital Markets, LLC ("FXCM") and Gain Capital Group, LLC ("Gain"), another registered FCM. Defendants actively traded these accounts and lost approximately $98,000 in forex trading. Defendants transferred the remaining money, approximately $85,000, from the trading accounts into Cloud's personal bank account.

**E.      Defendants Concealed Trading Losses and Misappropriation With False Statements**

In order to conceal and perpetuate their fraud, Defendants provided their customers with periodic false account statements misrepresenting customers' purported earnings from forex trading, indicating that Defendants' forex trading was profitable. The purported rates of return on these false account statements, which Defendants sent in the name of C & R Financial and not in the name of any FCM, ranged from eight to 259 percent for periods of only five to six months. In fact, rather than being profitable, Defendants incurred substantial losses trading forex which were not reflected in these statements.

**F.      Cloud Is a Controlling Person of C & R Financial**

At all material times, C & R Financial was wholly owned by Cloud, who held himself out to the public as the President and CEO of C & R Financial. Cloud solicited members of the general public to invest with C & R Financial, made the forex trades through iTrade and Gain, corresponded

5

with customers regarding their accounts, and sent the false account statements to customers.  Cloud

is the sole signatory on checks issued by C & R Financial and is the only person appearing on the

applications for C & R Financial's bank accounts.  As such, Cloud is a controlling person of C & R

Financial.  In this role, Cloud did not act in good faith or knowingly induced the acts discussed

herein.

## II.  CONCLUSIONS OF LAW

### A.    Defendants' Failure to Answer Warrants Entry of Default Judgment

Entry of default judgment is left to the sound discretion of the trial court.  *See Lacy v. Sitel*

*Corp.*, 227 F.3d 290, 292 (5th Cir. 2000) (court will review the denial of relief for default judgment

only for abuse of discretion) (citing *Gen. Tel. Corp. v. Gen. Tel. Answering Serv.*, 277 F.2d 919, 921

(5th Cir. 1960)); *SEC v. Lawbaugh*, 359 F. Supp. 2d 418 (D. Md. 2005)  While the Fifth Circuit has

a strong policy that cases should ordinarily be decided on the merits, *see United States v. One Parcel*

*of Real Property*, 763 F.2d 181, 183 (5th Cir. 1985), default judgment is appropriate when the

adversary process has been halted because of an unresponsive party.  *Sun Bank of Ocala v. Pelican*

*Homestead and Sav. Assoc.*, 874 F.2d 274, 276 (5th Cir. 1989) (citing *H.F. Livermore Corp. v.*

*Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).

Upon default, the well-pled allegations in the complaint are to be taken as true for purposes

of establishing liability.  *United States v. Shipco Gen., Inc.*, 814 F.2d 1011, 1014 (5th Cir. 1987); *see*

*also Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir.1975) (Courts

should circumscribe defendants' attempts to escape the effects of their default; they should not be

allowed to litigate what has already been considered admitted in law).

Defendants have not responded to the Complaint, have not attempted to dispute or defend against the allegations in the Complaint, and have not otherwise appeared in this action. *See generally* Docket. The Court, upon prior motion by the Commission, has entered a default against Defendants. *See* Dkt. 20. In light of the facts established above, this Court concludes that the entry of final judgment against Defendants is warranted as a matter of law.

**B.      Defendants Violated Sections 4b(a)(2)(A) - (C) of the Act**

Section 4b(a)(2) of the Act, as amended by the CRA, makes it unlawful:

for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of section 5a(g), that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market –

(A) to cheat or defraud or attempt to cheat or defraud the other person;

(B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]

(C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

To be codified at 7 U.S.C. § 6b(a)(2). Through their misappropriation, misrepresentations and omissions of material fact and issuance of false account statements, Defendants violated Sections 4b(a)(2)(A) - (C) of the Act, as amended by the CRA.

**1.      Fraud by Misappropriation**

Defendants violated Sections 4b(a)(2)(A) and (C) of the Act, as amended by the CRA, by misappropriating customer funds by (1) not depositing a portion of customer funds in any forex

7

trading account and (2) using customer funds for personal use.  As a result of Defendants' actions, approximately $289,000 of customers' funds is unaccounted for.

Misappropriation of customer funds constitutes "willful and blatant" fraud in violation of Sections 4b(a)(2)(A) and (C) of the Act.  *CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002), *cert. denied*, 537 U.S. 950 (2002) (defendants violated Section 4b(a)(2)(I) and (iii) (the predecessor to 4b(a)(2)(A) and (C)) by diverting investor funds for operating expenses and personal use); *CFTC v. King*, No. 3:06-CV-1583-M, 2007 WL 1321762, at *2 (N.D. Tex. May 7, 2007) ("King's violation of section 4b(a)(2)(I), (iii) [the predecessor to 4b(a)(2)(A) and (C)] of the [Act] is further proven by his admitted misappropriation of customer funds for personal and professional use."); *see also CFTC v. Skorupskas*, 605 F. Supp. 923, 932 (E.D. Mich. 1985) (holding that defendant violated Section 4b when he misappropriated pool participant funds by soliciting funds for trading and then trading only a small percentage of those funds, while disbursing the rest of the funds to investors, herself, and her family); *CFTC v. Weinberg*, 287 F. Supp. 2d. 1100, 1106 (C.D. Cal. 2003) (misappropriating investor funds violated Section 4b(a)(2)(I) and (iii) of the Act); *In re Slusser*, [1998-1999 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,701 at 48,315 (CFTC July 19, 1999), *aff'd in relevant part sub nom.*, *Slusser v. CFTC*, 210 F.3d 783 (7th Cir. 2000) (respondents violated Section 4b by surreptitiously retaining money in their own bank accounts that should have been traded on behalf of participants); *CFTC ex rel Kelley v. CFTC v. McLaurin*, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,768 at 44,180 (N.D. Ill. 1996) (by depositing customer funds in accounts in which the customers had no ownership interest and making unauthorized disbursements for his own use, defendant violated Section 4b of the Act).

8

###### 2.        Fraud by Misrepresentations and Omissions

"The elements of a fraud action under [Section] 4b are derived from the common law action for fraud." *Puckett v. Rufenacht, Bromagen & Hertz, Inc.*, 903 F.2d 1014, 1018 (5th Cir. 1990).  To establish that Defendants violated Section 4b(a)(2)(A) and (C) of the Act, as amended by the CRA, the CFTC must prove that (1) a misrepresentation, misleading statement, or deceptive omission was made; (2) with scienter; and (3) that the misrepresentation, misleading statement, or deceptive omission was material.  *King*, 2007 WL 1321762, at *2 (citing *CFTC v. R.J. Fitzgerald & Co.*, 310 F. 3d 1321, 1328 (11th Cir. 2002)).  Defendants—through their misrepresentations and omissions of material fact—violated Sections 4b(a)(2)(A) and (C) of the Act, as amended by the CRA.

###### a.        Defendants made Misrepresentations and Omissions to Customers and Prospective Customers

Defendants (1) failed to disclose that customer funds would be used for personal expenses; (2) failed to disclose to customers that only a portion of customer funds would be placed in forex trading accounts; (3) misrepresented that they would open trading accounts for individual customers at GFS and iTrade and instructed customers to complete account application forms that Defendants never submitted to GFS and iTrade; (4) failed to disclose to many customers that their investments would be pooled with those of other investors; (5) failed to disclose that customers' funds would be placed in trading accounts in Cloud's name, as opposed to the customers' names; (6) misrepresented the profitability of customers' accounts by providing customers with false account statements; and (7) failed to disclose that purported profits were paid to customers from existing customers' original principal and/or money invested by subsequent customers.   As discussed below, these misrepresentations and omissions were material.

### b.     Defendants Acted with Scienter

The scienter element is established when an individual's "conduct involves intentional omissions or misrepresentations that present a risk of misleading customers, either known to the defendant or sufficiently manifest that the defendant must have been aware of the risk." *King*, 2007 WL 1321762, at *2 (citing *R.J. Fitzgerald & Co.*, 310 F. 3d at 1328) (internal quotations omitted); *Wasnick v. Refco, Inc.*, 911 F.2d. 345, 348 (9th Cir. 1990) (citation omitted) (holding that scienter is established when an individual's acts are performed "with knowledge of their nature and character").  The Commission must demonstrate only that a defendant's actions were "intentional as opposed to accidental." *Lawrence v. CFTC*, 759 F.2d 767, 773 (9th Cir. 1985).  Scienter requires proof that a defendant committed the alleged wrongful acts "intentionally or with reckless disregard for his duties under the Act." *Drexel Burnham Lambert, Inc. v. CFTC*, 850 F.2d 742, 748 (D.C. Cir. 1988) (finding that recklessness is sufficient to satisfy scienter requirement); *Do v. Lind-Waldock & Co.* [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,516 at 43,321 (CFTC Sept. 27, 1995) (determining that a reckless act is one where there is so little care that it is "difficult to believe the [actor] was not aware of what he was doing"); *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 774 (9th Cir. 1995).

Defendants made misrepresentations or omissions of material fact with the requisite scienter. Defendants knew that they were making misrepresentations to customers when they (1) failed to disclose that customer funds would be used for personal expenses; (2) misrepresented that customers' funds would be invested in forex and did not disclose that only a portion of customers' funds would be placed in forex trading accounts; (3) misrepresented to customers that Defendants would forward account application forms completed by customers to GFS and iTrade and open

10

trading accounts for individual customers at GFS and iTrade; (4) misrepresented to some customers that their funds would be placed in individual trading accounts and not pooled with other customers' funds; and (5) misrepresented the profitability of customers' accounts by providing account statements to customers which contained false information.   Thus, Defendants acted with the requisite scienter.

### c.   Defendants' Misrepresentations and Omissions were Material

A statement is material if "there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest."  *R&W Technical Serv. Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000); *see also R.J. Fitzgerald*, 310 F.3d at 1328; *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 447 (D.N.J. 2000); *Commonwealth Fin. Group*, 874 F. Supp. 1345, 1353-54 (S.D. Fla. 1994).  Any fact that enables customers to assess independently the risk inherent in their investment and the likelihood of profit is a material fact.  *See In re Commodities Int'l Corp*., [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,943, at 44,563-64 (CFTC Jan. 14, 1997); *see also Saxe v. E.F. Hutton & Co., Inc*., 789 F.2d 105, 110 (2nd Cir. 1986) ("'material misrepresentations about the nature of the organization handling [an] account, the people [dealt] with, and the type of trading [the] funds were used for' would be sufficient to state a cause of action pursuant to the CEA.") (citing *Psimenos v. E.F. Hutton & Co. Inc*., 722 F.2d 1041, 1043-44 & n.5 (2nd Cir. 1983)).

As demonstrated above, Defendants violated Sections 4b(a)(2)(A) and (C) of the Act, as amended by the CRA, by misrepresenting the nature of the investment and its profitability.  Such misrepresentations and omissions are material in that a reasonable customer would want to know that (1) customer funds would be used for Defendant's personal expenses; (2) Defendants had not

deposited all of the customers' funds in forex trading accounts; (3) Defendants had not opened trading accounts for individual customers at registered FCMs; (4) Defendants pooled customers' funds into a trading account in Cloud's name; and (5) the account statements provided by Defendants contained misrepresentations about the value of customers' investments and purported "returns" on those investments.

### 3.  Fraud by Issuing False Account Statements to Participants

Defendants violated Section 4b(a)(2)(B) of the Act, as amended by the CRA, by providing false account statements to customers misstating the value of and trading activity in their accounts. Specifically, monthly account statements sent to customers by Defendants reported consistent monthly profits for customers' accounts when in fact Defendants' actual trading resulted in net losses in most months.  Delivering, or causing the delivery of, false account statements to commodity pool participants constitutes a violation of Section 4b(a)(2)(B) of the Act, as amended by the CRA.  *See, e.g., Skorupskas*, 605 F. Supp. at 932-33 (finding that defendant violated Section 4b(a) of the Act, the predecessor of Section 4b(a)(2)(B) as amended by the CRA by issuing false monthly statements to customers); *CFTC v. Sorkin*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,855 at 27,585 (S.D.N.Y. August 25, 1983) (determining that distribution of false account statements which falsely report trading activity or equity is a violation of Sections 4o and 4b of the Act); *Weinberg*, 287 F.Supp. at 1107 (false and misleading statements as to the amount and location of investors' money violated Section 4b(a) of the Act.); *Noble Wealth*, 90 F.Supp. 2d. at 685-87 (defendants violated Section 4b(a) of the Act through the delivery of false account statements).

**C.      C & R Financial is Liable Under Section 2(a)(1)(B) of the Act**

Cloud committed the acts and omissions described herein within the course and scope of his employment at C & R Financial.  Therefore, C & R Financial is liable under Section 2(a)(1)(B) of the Act, as amended by the CRA, as principal for its agent's violations of the Act and Regulations.

**D.      Cloud is Liable Under Section 13(b) of the Act**

As a controlling person, Cloud is liable for C & R Financial's violations of the Act pursuant to Section 13(b) of the Act, as amended by the CRA.  "This provision is construed to include individuals, associations, partnerships, corporations and trusts that exercise control over persons who violate the Act and fail to act in good faith." *CFTC v. Johnson*, 408 F.Supp.2d 259, 269 (S.D. Tex. 2005).  Indeed, "[a] fundamental purpose of [S]ection 13(b) is to allow the [CFTC] to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as on the corporation itself." *In re JCC, Inc.*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,080 at 41,576 (CFTC May 12, 1994) (finding principals of company liable because they were officers of corporation who were involved in monitoring sales activities), *aff'd sub nom JCC, Inc. v. CFTC*, 63 F.3d 1557 (11th Cir. 1995).  Pursuant to the Act, a controlling person is defined as "[a]ny person who, directly or indirectly, controls any person who has violated any provision of the Act [if that controlling person] did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation."  Section 13(b) of the Act, as amended by the CRA.

"A controlling person acts in bad faith if he 'did not maintain a reasonably adequate system of internal supervision and control over the [employee] or did not enforce with any reasonable diligence such system.'" *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992)

(quoting *Hendrickson v. Hendrickson*, 640 F.2d 880, 884 (7th Cir. 1981) (other citations omitted)). The controlling person must act recklessly; establishing negligence alone is insufficient to support liability. *G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 959 (5th Cir. 1981) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 209 n.28 (1976)). To establish the "knowing inducement" element, the CFTC must show that "the controlling person had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue." *Johnson*, 408 F.Supp.2d at 269 (quoting *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1568 (11th Cir. 1995)). Controlling persons cannot avoid liability by deliberately or recklessly avoiding knowledge about potential wrongdoing. *In re Spiegel*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103 at 34,767 (CFTC Jan. 12, 1988). Indeed, constructive knowledge of wrongdoing is sufficient for a finding of knowing inducement. *See JCC, Inc. v. CFTC*, 63 F.3d 1557, 1568 (11th Cir. 1995). To support a finding of constructive knowledge, the CFTC must show that a defendant "lack[ed] actual knowledge only because [he] consciously avoided it." *Id.* at 1569 (citations omitted).

At all material times, C & R Financial was wholly owned by Cloud, who held himself out to the public as the President and CEO of C & R Financial and solicited members of the general public to invest with C & R Financial. Cloud was the only person at C & R Financial with whom customers dealt. Cloud made the forex trades through iTrade and Gain, corresponded with customers regarding their accounts, and sent account statements. As such, Cloud is a controlling person of C & R Financial and he is liable under Section 13(b) of the Act because, as demonstrated above, he did not act in good faith and he knowingly induced the conduct that is violative of the Act.

14

**E.       There is a Reasonable Likelihood of Continued Misconduct by Defendants**

In addition to a violation, to be entitled to permanent injunctive relief, the Commission must also make a prima facie case showing that there is a "reasonable likelihood that the defendant is engaged or about to engage in practices that violate" the CEA.  *SEC v. First Fin. Group of Tex.*, 645 F.2d 429, 434 (5th Cir. 1981) (citing *Aaron v. SEC*, 446 U.S. 680, 699 (1980); *SEC v. Mize*, 615 F.2d 1046, 1051 (5th Cir. 1980); *SEC v. Savoy Indust., Inc.*, 587 F.2d 1149, 1168 (D.C. Cir. 1978)). Showing whether a defendant is "about to engage" in violations of the CEA "is usually made with proof of past substantive violations that indicate a reasonable likelihood of future substantive violations." *Id.* (citing *Savoy Indust.*, 587 F.2d, at 1168).

Defendants' repeated violations of the Act, as amended by the CRA, indicate a likelihood of continued violations absent a permanent injunction.  Defendants began soliciting customers to trade in forex at least as early as 2008, continuing through at least 2009.  These fraudulent solicitations were not isolated occurrences, but instead constitute an established pattern.  Defendants acted with knowledge that their representations were fraudulent and actively took steps to disguise their fraud, notably through sending fraudulent account statements to customers.  This pattern of fraudulent misrepresentations and efforts to disguise the fraud presents a "reasonable likelihood" of future violations.

## III.  RELIEF GRANTED

This Court hereby **ORDERS** that:  (a) Defendants are permanently enjoined from committing further violations of the Act, as amended by the CRA, and Regulations as charged and from engaging in any commodity-trading-related activity; (b) Defendants are required to make restitution to the

customers and investors they defrauded; and (c) a civil monetary penalty ("CMP") is imposed against Defendants in the amount of $5,070,000.

Section 6c of the Act, as amended by the CRA, 7 U.S.C. § 13a-17 U.S.C. § 13a-1 (2006), authorizes the Commission to seek permanent injunctive relief and CMPs, stating in relevant part:

> (a) Whenever it shall appear to the Commission that any registered entity or other person has engaged in, is engaging in, or is about to engage in any act or practice constituting a violation of any provision of this Act or any rule, regulation or order, thereunder . . . the Commission may bring an action in the proper district court of the United States . . . to enjoin such action or practice, or to enforce compliance with this Act, or any rule, regulation or order thereunder…

> (d) . . . the Commission may seek and the court shall have jurisdiction to impose, on a proper showing, on any person found in the action to have committed any violation a civil penalty in the amount of not more than the greater of $100,000 or triple the monetary gain to the person for each violation.

7 U.S.C. § 13a-1.  The maximum amount of civil monetary penalty was increased to $130,000 for violations between October 23, 2004 and October 22, 2008, and to $140,000 for violations on or after October 23, 2008.  17 C.F.R. § 143.8(a)(1)(iii)-(iv).  Restitution is ancillary equitable relief within the power of the district court to grant and is an appropriate remedy for violations of the Act. *See, e.g.*, *CFTC v. Co Petro Mktg. Grp., Inc*., 680 F.2d 573, 583-584 (9th Cir. 1982).

## A.       Permanent Injunction and Trading Prohibition Against Defendants

The Commission must show *only two things* to obtain permanent injunctive relief in an action under Section 6c of the Act, as amended by the CRA:  (1) that a violation of the Act has occurred; and (2) that there is a reasonable likelihood of future violations.  *Muller*, 570 F.2d at 1300. The Commission makes the requisite showing for issuance of injunctive relief when it presents a prima facie case that the defendant has engaged, or is engaging, in illegal conduct, and that there is a likelihood of future violations.  *CFTC v. Am. Bd. of Trade*, 803 F.2d 1242, 1250-51 (2d Cir. 1986);

16

*CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979), *cert. denied*, 442 U.S. 921 (1979).  Once the Commission demonstrates that the defendant violated the Act, then the Commission only needs to show that there is some reasonable likelihood of future violations to obtain injunctive relief.  To be sure, while past misconduct does not require the conclusion that there is a likelihood of future misconduct, it is "highly suggestive of the likelihood of future violations."  *Id.* at 1220; *see also CFTC v. Am. Metals Exch. Corp.*, 693 F. Supp. 168, 191 (D.N.J. 1988); *cf. SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981), *cert. denied*, 454 U.S. 1124 ("[T]he Commission is entitled to prevail when the inferences flowing from the defendant's prior illegal conduct, viewed in light of the present circumstances, betoken a 'reasonable likelihood' of future transgressions") (citations omitted); *Hunt*, 591 F.2d, at 1219-20 ( reversing the district court's denial of injunctive relief, and stating that a court of appeals should not hesitate "to reverse an order denying [injunctive] relief when it is evident that the trial court's discretion has not been exercised to effectuate the manifest objectives of the specific legislation involved.")

In contrast with other civil litigation, in an action for permanent injunctive relief, the Commission is not required to make a specific showing of irreparable injury or inadequacy of other remedies which private litigants must make.  *Muller*, 570 F.2d at 1300; *CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 141-42 (2d Cir. 1977), *cert. denied*, 438 U.S. 905 (1978); *United States v. Quadro Corp.*, 928 F. Supp. 688, 697 (E.D. Tex. 1996), *aff'd*, 127 F.3d 34 (5th Cir, 1997).[1]  Additionally, because enforcement proceedings under Section 6c of the Act, as amended by

---

[1]  The courts that have considered the "proper showing" standard for issuing a permanent injunction to prohibit future violations of a remedial statute have held that there must be (1) a showing that illegal activity has occurred and (2) a reasonable likelihood that the wrong will be repeated.  Kelley v. Carr, 567 F. Supp. 831, 839-40 (W. D. Mich. 1983); Rosenberg, 85 F. Supp. 2d at 454 ("The District Courts also have jurisdiction to enter a permanent injunction 'upon a proper showing.'").

the CRA, involve the public interest rather than a private controversy, the equitable jurisdiction of

the district court is not to be denied or limited in the absence of a clear legislative command. *Hunt*,

591 F.2d at 1222 (citing *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)); *Kelly v. Carr*,

442 F. Supp. 346, 360 (W.D. Mich. 1977), *aff'd in part and rev'd in part*, 691 F.2d 800 (6th Cir.

1980) (granting default judgment for permanent injunction).  In such a proceeding, the court's

equitable powers are broader and more flexible than in private controversies. *Hunt*, 591 F.2d at

1223.

     The egregious, systematic and widespread nature of Defendants' fraudulent conduct warrants

imposition of a permanent injunction against them.  Defendants Cloud and C & R Financial are

hereby permanently restrained, enjoined and prohibited from engaging, directly or indirectly, in:

A.    conduct that violates: Sections 4b(a)(1)(A) - (C) of the Act, as amended by the CRA,
to be codified at 7 U.S.C. §§ 6b(a)(1)(A) - (C)

B.    trading on or subject to the rules of any registered entity (as that term is defined in
Section 1a(29) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §
1a(29));

C.    entering into any transactions involving commodity futures, options on commodity
futures, commodity options (as that term is defined in Regulation 32.1(b)(1), 17
C.F.R. § 32.1(b)(1) (2009)) ("commodity options"), and/or foreign currency (as
described in Sections 2(c)(2)(B) and/or 2(c)(2)(C)(I) of the Act as amended by the
CRA, to be codified in 7 U.S.C. §§ 2(c)(2)(B) and/or 2(c)(2)(C)(I)) ("forex
contracts") for any account in which they have a direct or indirect interest;

D.      controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, and/or forex contracts;

E.      soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, and/or forex contracts;

F.      applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2009); and

G.      acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2009)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2009).

**B.      Restitution and Disgorgement**

1.      Legal Framework for Restitution and Disgorgement

As discussed above, Section 6c of the Act, as amended by the CRA, authorizes the Commission to bring an action to enjoin violations of, and enforce compliance with the Act.  In a civil enforcement action brought pursuant to Section 6c, the district court may order ancillary equitable relief that it deems appropriate.  *CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 193 (4th Cir. 2002) ("it is well settled that equitable remedies such as disgorgement are available to remedy violations of the [Act]"); *Co Petro*, 680 F.2d at 582-83 ("unless a statute specifically or by

19

inescapable inference commands the contrary, we are not to deny the inherent equitable powers of

a court to afford complete relief").  In *Co Petro*, the U.S. Court of Appeals for the Ninth Circuit held

that the ancillary relief available under Section 6c to enforce compliance with the Act includes the

power to order disgorgement, because "[f]uture compliance may be more definitely assured if one

is compelled to restore one's illegal gains.")  680 F.2d at 583 (quoting *Porter v. Warner Holding Co.*,

328 U.S. 395, 402 (1946)); *see also United States v. Universal Mgmt. Servs., Inc.*, 191 F.3d 750,

760-61 (6th Cir. 1999) ("[r]estitution and disgorgement are part of the court's traditional equitable

authority"); *Noble Wealth*, 90 F. Supp. 2d at 692-693.

The Court's determination of restitution in this case is governed by its equitable powers to

make whole the victims of Defendants' fraud.  The determination of restitution is not dependent on

submissions of claims by the victims.  Rather, the pervasive and systematic nature of the Defendants'

fraud makes all customer funds received subject to restitution.  *See CFTC v. Sidoti*, 178 F.3d 1132,

1138 (11th Cir. 1999) (affirming that the systematic and pervasive nature of fraud renders all funds

received by defendants unlawful, but limiting the period of disgorgement to the period of time as to

which the district court received evidence of fraud); *see also CFTC v. British Am. Commodity

Options Corp.*, 788 F.2d 92, 93 (2d Cir. 1986) (affirming imposition of disgorgement where fraud

was so pervasive that all profits were illegally derived).

2.    Restitution by Defendants

Restitution is measured by the amount invested by customers less any refunds made by the

Defendants.  *Noble Wealth*, 90 F. Supp. 2d at 693; *see also CFTC v. Marquis Fin. Mgt. Sys., Inc.*,

2005 WL 3752232, at *6 (E.D. Mich. 2005) (ordering restitution in the amount of net customer

deposits); *Rosenberg*, 85 F. Supp. 2d at 455 (ordering restitution in amount of customer deposit).

20

Defendants solicited approximately $585,000 from customers.  Dkt. 22, Exh. 4 ¶ 4.  They returned approximately $207,000 of that amount to customers, lost nearly $98,000 in forex trading, and retained the balance of $280,170.66 for their use and benefit as described above.  Dkt. 22, Exh. 4 ¶ 11.  Accordingly, Defendants are ordered jointly and severally to make restitution to C&R Financial's customers in the amount of $280,170.66, plus both pre-judgment and post-judgment interest.  Pre-judgment interest on the restitution amount should be paid at the then-prevailing underpayment rate established by the Internal Revenue Service, pursuant to 26 U.S.C. § 6621.  Post judgment interest should be paid at the then-prevailing Treasury Bill rate pursuant to 28 U.S.C. § 1961.  All restitution payments and any corresponding interest awards are deemed by the Court to be immediately due and owing.

### 3.    Appointment of Monitor and Collection and Distribution of Restitution

To effect payment by Defendants and distribution of restitution, the Court appoints the National Futures Association ("NFA") as Monitor.  The Monitor shall collect restitution payments from the Defendants and make distributions as set forth below.  Because the monitor would not be specially compensated for these services, and these services are outside the normal duties of the Monitor, the Monitor shall not be liable for any action or inaction arising from its appointment as Monitor, other than actions involving fraud.  The Monitor will oversee Defendants' restitution obligation and shall have the discretion to determine the manner of distribution of funds in an equitable fashion to Defendants' participants.

## C.    Civil Monetary Penalty

Section 6c(d)(1) of the Act, as amended by the CRA, provides that "the Commission may seek and the Court shall have jurisdiction to impose . . . on any person found in the action to have

committed any violation, a civil penalty in the amount of not more than the higher of $100,000 or triple the monetary gain to the person for each violation." 7 U.S.C. § 13a-1(d)(1). The Commission Regulations adjust the statutory civil monetary penalty of $100,000 for inflation. 17 C.F.R. § 143.8. For the period at issue here, the statutory civil monetary penalty was $130,000 per violation (for violations committed prior to October 23, 2008) and $140,000 per violation (for violations committed thereafter). *Id.*

The Court is free to fashion a civil monetary penalty appropriate to the gravity of the offense and sufficient to act as a deterrent. *Miller v. CFTC*, 197 F.3d 1227, 1236 (9th Cir. 1999). "In determining how extensive the fine for violations of the Act ought to be, courts and the Commission have focused upon the nature of the violations." *Noble Wealth*, 90 F. Supp. 2d at 694. Conduct that violates the core provisions of the Act, such as customer fraud, should be considered extremely serious. *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1571 (11th Cir. 1995). In *JCC, Inc.*, the U.S. Court of Appeals for the Eleventh Circuit upheld the district court order imposing a civil monetary penalty, finding that "[c]onduct that violates the core provisions of the Act's regulatory system – such as manipulating prices or defrauding customers should be considered very serious even if there are mitigating facts and circumstances." *Id.* at 1571-72. In the case at hand, there are no mitigating facts or circumstances. Instead, Cloud was blatant and malicious in his fraudulent conduct, enriching himself in the amount of at least $280,000 at the expense of his innocent victims, numbering at least 37.

This Court imposes a serious and significant sanction and orders Defendants to pay the statutory penalty amount for each customer they defrauded. *CFTC v. Millenium Trading Grp., Inc.*, 2007 WL 2639474 at *13-14 (E.D. Mich. Sept. 6, 2007); *CFTC v. United Investors Grp., Inc.*, 440

F. Supp. 2d 1345, 1361 (S.D. Fla. 2006), *aff'd in part and rev'd in part on other grounds*, 541 F.3d

1102 (11th Cir. 2008).  Defendants defrauded 37 customers during the period when the fine ranged

from $130,000 to $140,000.  The penalty therefore is calculated as follows:

| | | |
|---|---|---|
| 11 (customers defrauded before October 23, 2008) x $130,000 | = | $ 1,430,000.00 |
| 26 (customers defrauded after October 23, 2008) x $140,000 | = | $ 3,640,000.00 |
| Total Civil Monetary Penalty = | | $ 5,070,000.00 |

The civil monetary penalties assessed against Defendants shall be immediately due and

owing as of the date of this Order.  Further, post-judgment interest, calculated in the same manner

as post-judgment interest on restitution, as discussed above, shall begin accruing as of the date of

this Order.

Defendants shall pay their civil monetary penalties by electronic funds transfer, U.S. postal

money order, certified check, bank cashier's check, or bank money order made payable to the

Commodity Futures Trading Commission and sent to

> Commodity Futures Trading Commission
> Division of Enforcement
> Att'n:  Marie Bateman—AMZ-300
> DOT/FAA/MMAC
> 6500 S. MacArthur Boulevard
> Oklahoma City, Oklahoma 73169

If payment by electronic transfer is chosen, contact Marie Bateman at 405-954-6569 for instructions.

Defendants shall accompany payment of the civil monetary penalties with a cover letter that

identifies their name and the name and docket number of the proceeding.  Defendants shall

simultaneously transmit a copy of the cover letter and the form of payment to

Office of Cooperative Enforcement
Division of Enforcement
Commodity Futures Trading Commission
Three Lafayette Centre, 1155 21st Street, N.W.
Washington, D.C. 20581

**H.     Miscellaneous Provisions**

**Order of Payments**:  Defendants' obligation to pay restitution and civil monetary penalties are all due and owing as of the date of this Order.  Should Defendants, however, not be able to satisfy all these obligations at the same time, any payments from Defendants shall first be used to satisfy their restitution obligation.  After Defendants' restitution obligation is satisfied fully, then any of Defendants' payments shall be applied to satisfaction of the civil monetary penalties.

**Equitable Relief**:  The equitable relief provisions of this Order shall be binding upon Defendants and any person who is acting in the capacity of agent, employee, servant, or attorney of Defendants, and any person acting in active concert or participation with Defendants, who receives actual notice of this Order by personal service or otherwise.

**Notices**:  All notices required to be given to the CFTC or the NFA by any provision in this Order shall be sent certified mail, return receipt requested, as follows: Notice to CFTC: Attention - Director of Enforcement, Commodity Futures Trading Commission, Division of Enforcement, 1155 21st Street N.W., Washington, DC 20581; Notice to NFA – Daniel Driscoll, National Futures Association, 300 S. Riverside Plaza, Suite 1800, Chicago, IL 60606-3447.

**Continuing Jurisdiction of this Court**:  This Court shall retain jurisdiction of this cause to assure compliance with this Order and for all other purposes related to this action.

**Interest**:   This Court further Orders that pre and post-judgment interest should be awarded using the Treasury Bill rate prevailing on the date of the Court's final order in this matter pursuant to 28 U.S.C. § 1961(a) (2002).28 U.S.C. § 1961(a) (2002).

This Court shall retain jurisdiction of this case to assure compliance with the Order and for all other purposes related to this action.

It is SO ORDERED.

Signed at Houston, Texas on March 24, 2011.

_____
Gray H. Miller
United States District Judge

## RESTITUTION AMOUNTS

Restitution shall be apportioned to the following customers in the following amounts:

| | |
|---|---|
| Arres, Maria | $2,500.00 |
| Aviles, Orlando | $972.48 |
| Colvin, Gerald | $5,000.00 |
| Diggs, Randolph | $12,000.00 |
| Durst, Igalious and Rose | $7,000.00 |
| Everline, Eddie Jr. | $1,500.00 |
| Fischer, James | $2,741.10 |
| Fischer, Kimberly | $13,891.57 |
| Giles, Cornelius | $2,500.00 |
| Hernandez, Juan | $5,000.00 |
| Lawrence, Joseph | $40,000.00 |
| Lawson, Lashandra Makia | $5,000.00 |
| Munguia, Kristina | $2,000.00 |
| Reed, Willie | $1,500.00 |
| Scroggins, Bobby | $9,743.74 |
| Scroggins, Tom | $4,000.00 |
| UNKNOWN | $41,821.77 |
| Villarreal, Carlos | $10,000.00 |
| Villarreal, Juan | $10,000.00 |
| Washington, Martin | $5,000.00 |
| Williams, Joseph L. | $50,000.00 |
| Williams, Lakeland | $45,000.00 |
| Wilson, Stephanie | $3,000.00 |